IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

JOSH HENLE                          )
and KATHRYN HENLE,                   )
                                     )
            Plaintiffs,              )     TC-MD 210064R
                                     )
      v.                             )
                                     )
CLACKAMAS COUNTY ASSESSOR,           )
                                     )
            Defendant.               )     **DECISION**

Plaintiffs appealed Defendant's Board of Property Tax Appeals (BOPTA) Real Property

Order, dated February 16, 2021, for the 2020-21 tax year.  Trial was held remotely via Webex.

Josh Henle (Henle) appeared on behalf of Plaintiffs and testified on his own behalf.  Greg

Lamunyan (Lamunyan), appraiser and owner of Portland Residential Appraisals, testified on

behalf of Plaintiffs.  Julie Stephens (Stephens), real estate broker at More Realty, also testified on

behalf of Plaintiffs.  Todd Cooper, Clackamas County Appraisal Supervisor, appeared on behalf

of Defendant.  Betsy Harris, Clackamas County Senior Appraiser, testified on behalf of

Defendant.  Plaintiffs' Exhibits 1 to 117 and Defendant's Exhibits A to H were admitted into

evidence.

## I.  STATEMENT OF FACTS

This appeal concerns the extensive construction work carried out on Plaintiffs' single-

family residence, identified as Account 00229390 (subject property), and the resulting increases

to Plaintiffs' property tax roll real market value (RMV), exception value, and maximum assessed

value (MAV) for the 2020-21 tax year.  Plaintiffs' residence, located in the Lake Forest

neighborhood of Clackamas County, which includes properties in an unincorporated area of

Clackamas County and properties annexed into the City of Lake Oswego, was originally built in

1946, expanded in 1993, and a new detached garage built in 2017. In 2019, Plaintiffs carried out substantial work on their property. Plaintiffs consider this work as a remodel, while Defendant characterizes it as a near-complete rebuild. As a condition for receiving permits for substantial construction, the subject property had to be annexed into the City of Lake Oswego and connected to the city sewer system. The parties dispute the impact of those changes on the value of the subject property.

As of January 1, 2020, the subject property consisted of a 3,684 square foot residence on a 19,588 square foot lot, and a detached garage with extra space that could be used as a shop or a third tandem parking space. The parties agree that the highest and best use of the subject property is its current use as a single-family residence, but Defendant also notes that because of the lot size, it could also be subdivided—a fact that Defendant considered when selecting comparable properties. The parties also agree that the changed property ratio (CPR) for the tax year under appeal was 0.644 percent.

BOPTA lowered the subject property's 2020-21 real market value from $1,047,278 to $1,020,000, the exception value from $512,896 to $485,618, and the maximum assessed value from $605,394 to $587,826. The subject property's maximum assessed value on the 2019-20 tax roll was $267,077.

A.    *Plaintiffs' approach to value*

Lamunyan, a principal appraiser at Portland Residential Appraisals who has held a Senior Residential Appraiser designation from the Appraisal Institute for over 10 years, prepared a retrospective appraisal of the subject property, as of the assessment date—January 1, 2020. Although the property had undergone significant construction in 2019, Lamunyan determined the property's effective age to be five years because several front rooms retained their original

dimensions and older feel. In his preliminary research, Lamunyan observed that homes in the general area of the subject property are diverse, including both older homes and newer builds. Lamunyan found that during 2018 and 2019, in the same zip code as the subject property's (97035), the real property market was relatively flat. However, specifically in the Lake Forest neighborhood, Lamunyan found that in 2020, the price of homes increased at an accelerated rate. To account for the accelerated rate of inflation in his appraisal, Lamunyan determined that a monthly adjustment of one percent should be applied to each comparable sale for each month following the sale of the comparable property, dating back to January 2020.

In conducting his appraisal, Lamunyan relied primarily on the sales comparison approach, rejecting the income approach as not applicable to a non-income-generating owner-occupied single-family residence and considered the cost approach only as a test of reasonableness. Lamunyan evaluated the land and improvements separately.

For the land component, Lamunyan selected four comparable land sales ranging from $385,000 to $425,000, unadjusted. Each of these comparable sales were adjusted downward due to the sales having occurred after the assessment date. Lamunyan determined the land value was $372,000 ($18.99 per square foot), as of January 1, 2020. He then adjusted the land value upward for excavation, grading, backfill, city utilities, landscaping, irrigation, and fencing, bringing the site value up to a rounded $415,000.

Lamunyan considered six comparable sales to value the subject property ranging from adjusted values of approximately $1 million to $1.1 million and concluded the value of the subject property was $1,050,000.[1] (Ex 11 at 33.) He rejected partition of the lot as not feasible

---

[1] It is unusual, perhaps even perilous, for a taxpayer to argue on appeal that their real market value is higher than the roll or BOPTA value such as Plaintiffs are here. In this case, Plaintiffs took a calculated risk, one that future litigants should consider circumspectly.

because the garage would have to be torn down, making it too expensive. Lamunyan did not consider an adjustment for the change from septic to sewer because he did not believe market participants would place any value on the conversion.

Stephens testified she has been a real estate broker for over 25 years and assisted Plaintiffs in their decision to improve the subject property. She testified that, in her experience, buyers and sellers do not place any value difference on septic versus sewer, so long as the septic system is working properly, which was the case for this property.

B.      *Defendant's approach to value*

Harris is a Senior Appraiser for Defendant. She testified that during the 1994-95 tax year, Defendant negatively adjusted many properties' tax values, including the subject property's, by approximately $33,360 because the properties were on septic. She testified that as properties transitioned to public sewer, and after passage of Measure 50, positive adjustments were made to properties' maximum assessed values. She opined that annexation of the subject property and a switch from septic to the city sewer system added value to the subject property and should be reflected in additions to the maximum assessed value. Harris prepared a report she titled "Paired Sales Analysis" to demonstrate that the values of properties with sewer were worth substantially more than properties on septic. (Ex E.) In her analysis, Harris used two sample properties as controls, comparing each of them to four properties, each of the four having been valued both with and without sewer access. Harris observed the results of her Paired Sales Analysis as tending to demonstrate the general value of a sewer conversion. On cross-examination, she stated that Defendant added $125,000 in exception value to the land based on the sewer conversion.

/ / /

Harris testified that the construction work carried out on the subject property was much more extensive than Defendant knew at the time of the BOPTA hearing, and this resulted in a higher value presented at trial. Based on pictures she obtained on Plaintiffs' contractor's website, she opined that the construction was closer to a full rebuild of the property than a remodel. She determined the highest and best use of the property was as a single-family-residence. However, because of the lot size and the potential for subdividing or adding an accessory dwelling unit, she considered comparable property sales with those factors in mind. Harris testified that her land estimate of the subject property site was $450,000, and that she performed three versions of the cost approach, concluding the value of the subject property was $1.2 million. (Ex B at 29-31.)

Harris further testified that she prepared two retrospective appraisals, one pre-rebuild and one post-rebuild, in order to calculate the appropriate changes to the maximum assessed value. In Exhibit A, Harris used the figure $537,862 for the pre-rebuild value and explained, the "2020-2021 roll value before exception is used rather than the 'before' rebuild value due to the omitted remodel that was discovered while completing the appraisal. If the remodel would have been known, the omitted value would have been reflected in the RMV as well as the 'Base MAV'." (Ex A at 4.) In Harris' "before" rebuild appraisal value, she selected four comparable properties that were all on septic. The adjusted sales prices were $543,000, $595,400, $580,300 and $580,700 for comparable sales one, two, three, and four, respectively. The two most significant adjustments for all comparable sales were for the assumption of a nine percent increase in the market price per year, corresponding to a 0.75 percent per-month increase (Ex B at 5-6), and very large adjustments based on Plaintiffs' oversized garage and storage space. Harris placed the most weight on comparable sales three and four, and concluded that including some

improvements that the assessor was originally unaware of, the value of the subject property before the rebuild should be increased to $580,000. (Ex B at 28.)

## II. ANALYSIS

The primary issue on appeal is the subject property's maximum assessed value for the 2020-21 tax year, following the substantial improvements made to the subject property in 2019. A secondary issue is the subject property's real market value, which is a necessary component in computing the maximum assessed value. "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

Generally, the maximum assessed value of a property can only increase by three percent annually, unless an exception to the general rule applies, such as for new property or new improvements, allowing for a greater increase. ORS 308.146(1);[2] *see also* ORS 308.153. If "improvements are made to property as of January 1 of the assessment year, the maximum assessed value of the property is the sum of:

"(a) The maximum assessed value determined under ORS 308.146; and

"(b) The product of the value of the new property or new improvements determined under subsection (2)(a) of this section multiplied by the ratio, not greater than 1.00, of the average maximum assessed value over the average real market value for the assessment year."

ORS 308.153(1). A determination of the property's maximum assessed value under ORS 308.153(1) effectively translates to a multiplication of the real market value of the new

///

///

---

[2] The court's references to the Oregon Revised Statutes (ORS) are to 2019.

improvements with the changed property ratio,[3] and adding the result of that multiplication to the existing maximum assessed value determined under ORS 308.146.

The mathematical calculation described in ORS 308.153(1) is best explained in the Department of Revenue's May 2018 *Maximum Assessed Value Manual*, which breaks the calculation down into six steps. The six-step calculation is as follows:

> "Step 1: Establish base MAV: Always start with the property as if no changes had occurred. Apply the 103 percent test * * *. This results in the Base MAV.
>
> "Step 2: Determine the unaffected RMV: Determine what the RMV of the property would be if property **hadn't changed** (unaffected).
>
> "Step 3: Determine the new RMV of the property with the changes (affected portion and possibly unaffected portion).
>
> "Step 4: Calculate the amount of exception RMV:
>
> New RMV - Unaffected RMV = Exception RMV
>
> "Step 5: Calculate the exception MAV: this we be the amount we are authorized to add to MAV:
>
> Exception RMV x CPR = Exception MAV
>
> "Step 6: Calculate the new MAV:
>
> Exception MAV + Base MAV = New MAV (Only one MAV per account)"

*Id*. at 4-3. Having clarified the calculation methodology, the court proceeds with its application to the subject property.

/ / /

/ / /

---

[3] The CPR is "the ratio of average maximum assessed value to average real market value of property located in the area in which the property is located that is within the same property class." Or Const, Art XI, § 11(1)(c); *see also* ORS 308.153(1)(b).

A.    *Step 1, establishing the base maximum assessed value*

Step 1 is a straightforward, undisputed calculation.  The subject property's maximum assessed value on the 2019-20 tax roll was $267,077.  (Ex 20 at 2.)  That figure is multiplied by 103 percent, which yields a base maximum assessed value of $275,089 (rounded).

B.    *Step 2, determine the unaffected real market value*

Step 2 requires that the court determine what the real market value of the property would have been on the assessment date had the new improvements not been made.  The theory behind this step is to account for changes to the property value, such as market changes, so that the value of the improvements can be isolated.

Plaintiffs submitted a bank appraisal report that determined the market value of the subject property, was $620,000 as of July 17, 2018 (prior to the 2019 improvements).  (Ex 29 at 2.)  Because the unaffected value determined in this step must be as of the January 1, 2020, assessment date, an adjustment must be applied for the time difference.  Plaintiffs did not supply the court with a figure for that time adjustment.  Lamunyan did however analyze the median price for sales of single family detached homes in the subject property's zip code, and he determined that changes in price were relatively flat in both 2018 and 2019, but increased by 12 percent in 2020.  (Ex 11 at 21.)  Thus, under Plaintiffs' evidence, there should be no adjustment for time, and the unaffected real market value should remain at $620,000.

Defendant presented several conflicting figures representing the unaffected real market value.  In Exhibit A, it valued the unaffected real market value at $537,862 and continued to explain, the "2020-2021 roll value before exception is used rather than the 'before' rebuild value due to the omitted remodel that was discovered while completing the appraisal.  If the remodel would have been known, the omitted value would have been reflected in the RMV as well as the

'Base MAV'." (Ex A at 4.) This method of calculating the unaffected real market value is incorrect. (*See* Department of Revenue's May 2018 *Maximum Assessed Value Manual* at 4-3.) However, Defendant also presented an appraisal of value before the rebuild. (Ex B at 28.) In their pre-rebuild appraisal, Harris selected four comparable properties, each of which being served by a septic system. Harris placed the most weight on comparable sales three and four. She concluded that because "the [a]ssessor was unaware of" prior work that had occurred on the home, the "'before' rebuild conclusion" should be increased to $580,000. (*Id.*)

The court first observes that the parties' competing appraisal values are not very far apart. Plaintiffs' appraisal, although it is a bank appraisal and is usually less persuasive, contains pictures of the subject property showing that it was in good condition prior the 2019 renovations. In reviewing Defendant's appraisal, several of the comparable sales appear to be in very poor condition, and Harris makes negative $25,000 adjustments to comparable sales three and four for condition, which appear unwarranted without further explanation. (Ex B at 23.) Thus, the court finds Plaintiffs' unaffected real market value at $620,000 more persuasive.

C.      *Step 3, determine the new real market value of the property*

The parties' conclusions of the subject property's real market value post-remodel are also only minimally different. The key difference between the parties' values is that Lamunyan's conclusion rests upon a determination that the remodel maintained a certain portion of the original structure, which renders the design slightly inferior compared to newly designed and built homes. Harris, on the other hand, maintained that the subject property's remodel was so extensive, that it essentially rendered the home comparable to a newly built home. Additionally, Lamunyan relied on the sales comparison approach, while Harris placed more reliance on the cost approach.

The court finds Lamunyan's testimony on the sales comparison approach and his conclusion that potential buyers would value a structure that maintained portions with older dimensions less than a newly built structure, was more persuasive than Harris' testimony. The cost approach for this single-family residence does not appear to be an accurate reflection of how an arm's length purchaser would evaluate the property. Harris' "Paired Sales Analysis" makes multiple adjustments to the comparable properties and does not persuasively demonstrate that the value differences are mainly due to sewer conversions. Although it is possible that a septic-to-sewer conversion could potentially affect property values, in this case, the testimony from Lamunyan and Stephens stating that there should be no value adjustment is more persuasive. The court finds the new real market value, or post-remodel real market value, at $1,050,000.

D.    *Step 4, calculate the exception real market value*

Plaintiff's analysis concludes that the exception real market value equals $352,034. (Ex 3 at 1.) Defendant requests that the value be increased from $485,618 to $665,618. (Ex A at 4.) Under this step, the amount of the exception real market value equals the new real market value found in step 3 ($1,050,000) minus the unaffected real market value found in step 2 ($620,000), resulting in an exception real market value of $430,000.

E.    *Step 5, calculate the exception maximum assessed value*

Calculating the exception maximum assessed value is a necessary step because increases to the maximum assessed value based on exception events are not added at 100 percent, but rather are added by a changed price ratio generally determined by counties. In this case, the parties agreed that the changed price ratio is 0.644 percent. Multiplying the exception real market value found in step 4 with the agreed upon changed price ratio yields an exception maximum assessed value of $276,920.

F.      *Step 6, calculate the new maximum assessed value*

The new maximum assessed value equals the exception maximum assessed value found

in step 5 ($276,920) added to the base maximum assessed value found in step 1 ($275,089),

resulting in a total new maximum assessed value of $552,009.

### III.  CONCLUSION

The court finds Plaintiffs' evidence generally more persuasive than Defendant's

evidence.  However, the court disagrees with Plaintiffs' calculations of the exception value and

maximum assessed value.  Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is granted.  The subject

property's real market value is $1,050,000, the exception maximum assessed value is $276,920,

and the maximum assessed value is $552,009, for the 2020-21 tax year.

Dated this _____ day of February 2023.


                                                    _____
                                                    RICHARD DAVIS
                                                    MAGISTRATE


*If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of this Decision or this Decision cannot be changed.  TCR-MD 19 B.*

*This document was signed by Magistrate Richard Davis and entered on February 15, 2023.*